**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

KATRINA NAKANISHI,

        Plaintiff,

                                **Case No. 2:16-cv-988**

    v.                           **JUDGE MICHAEL H. WATSON**

                                  **Magistrate Judge Chelsey M. Vascura**

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Katrina Nakanishi ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11), Defendant's Memorandum in Opposition (ECF No. 14), Plaintiff's Reply to Defendant's Memorandum in Opposition (ECF No. 15), and the administrative record (ECF No. 10). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** the Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.      BACKGROUND

Plaintiff protectively filed her application for benefits on April 26, 2013, and alleges that she became disabled on March 30, 2007. Plaintiff's date last insured ("DLI") was September 30, 2009. On August 18, 2015, following initial administrative denials of her claim, Plaintiff was given a hearing before Administrative Law Judge Irma J. Flottman (the "ALJ") (ECF No. 10-2, at PAGEID# 82-110.) At the hearing, Plaintiff, represented by counsel, appeared and testified. On

September 17, 2015, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (*Id*. at PAGEID# 67-74.)

On August 27, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (*Id*. at PAGEID# 51-53.)  Plaintiff then timely commenced the instant action.  (ECF No. 1.)

## II.    HEARING TESTIMONY

### A.  Plaintiff's Testimony

Upon examination by the ALJ, Plaintiff testified that she had a high school education but no specialized vocational training.  (ECF No. 10-2, at PAGEID# 87-88.)  Plaintiff said she worked part-time job in 2011 and 2012, but she had stopped working at that job after she was no longer needed and had not tried to return to work since.  (*Id*. at PAGEID# 88.)  Plaintiff testified that prior to 2011, she had last worked in a doctor's office, first as a room assistant and then taking phone calls, but left that job in 2007 due to her back and mental health issues.  (*Id*. at PAGEID# 89-90.)  Before working in the doctor's office, Plaintiff had worked as an assistant to a physician for approximately eight months.  (*Id*. at PAGEID# 90.)

When asked about the problems that caused her to stop working, Plaintiff testified that she had "[a] lot of lower back pain, and some pain in both legs, not all the way down but just to my knees."  (*Id*. at PAGEID# 91.)  She described the pain as [h]urting, burning, some … sharp pains, like muscle spasms."  (*Id*.)  Initially, she experienced this pain "once in a while" but it "became more dominant as the day wore on."  (*Id*.)  The pain occurred "maybe every other day" until it eventually became "more consistent" requiring Plaintiff to quit her job.  (*Id*.)  While she was still working, she received "several epidural shots" and pain medication and went to physical therapy.

(*Id*. at PAGEID# 91-93.)  She did not remember how frequently she attended physical therapy, why she stopped physical therapy, or the names of any pain medication she took.  (*Id*.)

Plaintiff also testified that she fell and injured her right knee, requiring several surgeries. (*Id*. at PAGEID# 93.)  This injury caused a lot of pain and impacted her back because she walked unevenly.  (*Id*. at PAGEID# 94.)  She is not positive whether she attended physical therapy for this injury but believes that she did.  (*Id*.)  She did not wear a knee brace or use a cane for either her back or knee condition.  (*Id*.)  Instead, to eliminate the symptoms of these conditions, Plaintiff elevated her feet "pretty much every day," and used ice packs and a heating pad along with her medications.  (*Id*.)

Plaintiff also testified that she suffers from migraine headaches "pretty much on a regular basis."  (*Id*. at PAGEID# 95.)  At one point, they became so severe that she would throw up and would have to go to the emergency room to get a pain shot.  (*Id*.)  Plaintiff's migraines occurred several times a month and could sometimes last two days.  (*Id*.)  She tried "multiple medications" and "it was a long time trying to figure out what [she] needed to do to help the migraines."  (*Id*.)

Plaintiff further testified that she suffered from PTSD and is bipolar causing "a lot of anxiety and panic attacks."  (*Id*. at PAGEID# 96.)  Plaintiff described her instances of panic attacks from 2007 through 2009 as "very minimal."  (*Id*.)  She was hospitalized in March 2009 for two or three days and received treatment for depression after that. (*Id*. at PAGEID# 96-97.)  Around this same time, Plaintiff went to the emergency department at Mount Carmel.  (*Id*. at PAGEID# 96.) Plaintiff's treatment for depression included psychiatric counseling and "multiple different medications."  (*Id*. at PAGEID# 97.)

When asked by the ALJ about the impact of these conditions, Plaintiff stated that in 2009, she could walk, at most, 10 to 15 minutes.  (*Id*.)  Further, using television watching as an example,

Plaintiff explained that she could probably sit for 20 minutes before she needed to get up and walk around for a few minutes. (*Id*. at PAGEID# 97-98.) Plaintiff believed she could lift about ten pounds but had "a lot or problems" going up and down a flight of stairs. (*Id*. at PAGEID# 98). She could not kneel or crouch. (*Id*. at PAGEID# 99.)

Plaintiff testified that between March 2007 and September 2009, after she stopped working at the doctor's office, a typical day included "very basic" cleaning. (*Id*. at PAGEID# 99-100.) She did not run the sweeper or mop the floor, cooked minimally, and found bending over for the dishwasher to be "an ordeal." (*Id*. at PAGEID# 100.) She did some shopping but usually took her husband with her and did not always finish a shopping trip. (*Id*.) She did laundry but her husband "helped a lot" because "[g]oing up and down the steps was an issue." (*Id*.) She did not do any yard work or gardening. (*Id*.) She was able to drive but getting in and out of the car caused problems. (*Id*.)

Plaintiff attended church every Sunday and usually Sunday night. (*Id*. at PAGEID# 100-101). Sometimes she helped at church by serving food but asked to sit while she served. (*Id*. at PAGEID# 101.) Beyond her church, Plaintiff was not involved in any other groups or organizations although she did socialize with friends. (*Id*.) She spent "several hours" a day in bed icing her back, applying a heating pad, and elevating her feet. (*Id*. at PAGEID# 102.)

In response to questioning by her counsel, Plaintiff testified that around March 2009, she began seeing Dr. Mendola and Mr. Tom Butler for her mental health issues. (*Id*. at PAGEID# 103.) At the time of the hearing, she was still seeing Mr. Butler once every two weeks. (*Id*.) During the relevant time period in 2009, Plaintiff was seeing Mr. Butler weekly and sometimes twice a week "because of the severity of the PTSD and the bipolar." (*Id*.) She explained that she could feel a panic attack coming on, that they could last for an up to an hour and once up to two hours, and that

sometimes their severity had caused her to pass out.  (*Id*. at PAGEID# 103-104.)  With respect to

her PTSD and bipolar conditions, Plaintiff stated that the PTSD "was very traumatic" and she had

racing thoughts making it "very hard to keep [her] composure a lot of the times."  (*Id*. at PAGEID#

104.)  In 2009, she "cut ties" with her family and friends because she felt safer in her own home.

(*Id*. at PAGEID# 105.)

### B.   Vocational Testimony

Vocational expert Dr. Walter Walsh (the "VE") also testified at the administrative hearing.

(ECF No. 10-2, at PAGEID# 105-108.)  The VE testified that Plaintiff's past jobs included the

following:  nurse assistant, medium strength, semi-skilled and medical receptionist, sedentary,

semi-skilled. (*Id*. at PAGEID# 106.)  The VE was provided the following hypothetical to consider:

> I want you to first assume the claimant has the ability to lift or carry
> up to 50 pounds occasionally, 25 frequently, stand or walk up to six
> hours in an eight-hour work day, sit up to six hours in an eight-hour
> work day.   No climbing ladders, ropes or scaffolds, occasional
> climbing ramps or stairs, occasional crouching, kneeling and
> crawling, just with those limitations, could she do the past work?

(*Id*.)  In consideration of the hypothetical, the VE concluded that Plaintiff could do her past work.

(*Id*.)  The ALJ then modified the hypothetical as follows:

> If I were to reduce the lifting and carrying to 20 pounds occasionally,
> ten pounds frequently, standing and walking and sitting would remain
> as I identified.   And then the postural limitations I gave you would
> remain as identified with the first hypothetical, could she do the past
> work?

(*Id*. at PAGEID# 107.) The VE responded to this hypothetical by stating that Plaintiff could do her

past sedentary work as a receptionist.  The ALJ further modified the hypothetical as follows:

> If I were to add limitations of simple, routine, repetitive task[s], with
> only occasional interaction with the public and only occasional
> interaction with coworkers to those first two hypotheticals, could she
> do the past work?

(*Id*.)  The VE responded to this further modified hypothetical by stating that Plaintiff could not do her past work. (*Id*.)  Finally, the ALJ asked the following:

> And then could you given a hypothetical individual the same education, work background as the claimant, with the RFC that I gave you, including the mental health limitations, could you identify any work for either of those hypotheticals?  So the first one was the lifting and carrying up to 50 pounds, 25 pounds frequently with the postural limits.

(*Id*.)  The VE testified that there would be unskilled work that the Plaintiff could perform.  (*Id*.)  For example, with respect to the first hypothetical consistent with medium strength, unskilled work, the VE stated that there would be available work as an order filler with about 3400 jobs available in the state and about 88,00 jobs available nationally. (*Id*.) Further, there would be available work as a packager with 8500 jobs available in the state and about 156, 000 jobs available nationally. (*Id*.) Finally, there would be available jobs as a marker with about 2000 jobs in the state and about 70,000 jobs available nationally.  (*Id*. at PAGEID# 108.)

With respect to the second hypothetical, the VE testified that such jobs would be light strength and unskilled and would include work as a packager with about 12,000 jobs available in the state and 302,000 jobs available nationally.  (*Id*.)  Further, there would be work as a marker with about 6000 jobs available in the state and about 175,000 jobs available nationally.  (*Id*.)  Finally, there would be work as a stock person with about 9,000 jobs available in the state and about 240,000 jobs available nationally.  (*Id*.)

The VE testified that, if an individual were off-task more than ten percent of the time in addition to regularly scheduled breaks, such a scenario would constitute "accommodated work not competitive work."  (*Id*.)  Finally, the VE testified that if an individual missed up to two days of work in a month, "that would not be consistent with competitive work on a sustained basis."  (*Id*.)

# III.    RELEVANT MEDICAL RECORDS

The pertinent medical records for purposes of analyzing Plaintiff's contentions of error are the records relating to Plaintiff's alleged migraines, degenerative lumbar disc disease, and mental impairments.

## A.    Migraine Headaches

With respect to Plaintiff's migraine headaches, the records indicate that in December 2006, several months prior to her alleged onset date, Plaintiff was seen in the emergency room at Mt. Carmel East for a headache.  (*Id*. at PAGEID# 409-410.)  In May 2008, Plaintiff presented to the hospital with complaints of neck pain and headaches.  (*Id*. at PAGEID# 388-403.)

Seven months later, in December 2008, Plaintiff saw a nurse practitioner at Mt. Carmel Neurology Providers for migraine headaches.  (*Id*. at PAGEID# 265-66.)  The nurse practitioner noted that when Plaintiff had last reported in May, she "had been doing pretty well for the past couple of years" but that "several things happened in the last several weeks," including Plaintiff stopping her birth control and undergoing knee and bladder surgery.  (*Id*.)  Plaintiff reported that her headaches returned with an increase in intensity and frequency and that they were mostly associated with her menses.

Plaintiff was seen again at Mt. Carmel Neurology Providers on February 2, 2009, for her first visit with Dr. Patrina Trakarnpan.  (*Id*. at PAGEID# 263-264.)  At that time, Plaintiff reported that she was having "frequent migraine headaches in the past" that "were quite severe" with one episode of decreased vision.  (*Id*. at PAGEID# 263.)  She had had a "severe increase in her headache frequency" in December 2008, but since then, her headaches significantly decreased in frequency, and she did not get headaches with her periods in January or February.  (*Id*.)  Dr. Trakarnpan noted that Plaintiff's MRI findings were normal.  Dr. Trakarnpan performed a physical

examination and observed only normal findings, including normal motor testing, reflexes, and gait. Dr. Trakarnpan noted that Plaintiff had a flare-up in December, but concluded that Plaintiff's "headaches are well-controlled at this time." (*Id*. at PAGEID# 264.) She opined that Plaintiff's December 2008 flare-up was likely attributable to going off her birth control pills and undergoing two surgeries. (*Id*. at PAGEID# 263.) Plaintiff was advised to call if her migraines worsened.

Plaintiff did not return to Mt. Carmel Neurology Providers again until April 2010, approximately fourteen months since her previous visit and more than six months after her DLI. At this April 2010 visit, the nurse practitioner noted that Plaintiff's "headaches are under better control" and "are pretty good" and that Plaintiff had decreased her medication. (*Id*. at PAGEID# 1115.)

Dr. Yao (née Trakarnpan) next saw Plaintiff in October 2010, more than a year after Plaintiff's DLI. Plaintiff reported that her headaches had returned "a couple of weeks ago." (ECF No. 10-11, at PAGEID# 1113.) Dr. Yao performed a physical examination and observed only normal findings, including normal motor testing, reflexes, and gait. Dr. Yao increased Plaintiff's medication. Dr. Yao continued to treat Plaintiff, with the last treatment record dated October 29, 2013. During this visit, Plaintiff reported that she continued to experience headaches sporadically. She also reported experiencing back pain and some decreased balance. Upon physical examination, Dr. Yao observed that Plaintiff "had some mile difficulty tandem walking." (*Id*. at PAGEID# 1091.) All other findings were normal. Dr. Yao assessed that Plaintiff had "migraine headaches that are intractable," that she was not "in status," that "[s]he does not have an aura," and that "[s]he has also been having some mild decreased balance/gait disorder and back pain." (*Id*.) Dr. Yao increased her medication.

**B.     Degenerative Lumbar Disc Disease**

In August 2007, Plaintiff reported to Nurse Practitioner Regina Massey at Mount Carmel Neurology providers that she had fallen on the ice in February 2007 and then again while going up steps and that she had hurt her back and knee during the falls.  (ECF No. 10-7 at PAGEID# 266.) She indicated that she planned to seek treatment for her back in September with Dr. Mullin.

Plaintiff was seen by Dr. Bradford Mullin of Central Ohio Neurological Surgeons on September 11, 2007. (ECF No. 10-7, at PAGEID# 256.)  Dr. Mullin reported that Plaintiff "has stenosis at L4-5" and he "believe[d] a very small amount of spondylolisthesis at L4-5."  (*Id*.)  Dr. Mullin reviewed the MRI of Plaintiff's cervical spine and concluded that it "showed minimal degenerative changes at C3-4, 4-5, and 5-6 [with] no canal stenosis or foraminal narrowing."  (*Id*.; *see also* ECF No. 10-2, at PAGEID# 405).)  He recommended conservative treatment.

As set forth above, in February 2009, neurologist Dr. Yao (née Trakarnpan) performed a physical examination and observed all normal findings, including normal motor testing, reflexes, and gait.  (*Id*. at PAGEID# 264.)

Dr. Yao (née Trakarnpan) next saw Plaintiff in October 2010, more than a year after Plaintiff's DLI.  During this visit, Dr. Yao again performed a physical examination and observed only normal findings, including normal motor testing, reflexes, and gait.  (ECF No. 10-11, at PAGEID# 1113.)

In February 2012, approximately 2.5 years after her DLI, Plaintiff reported to Dr. David Hannallah with complaints of low-back pain.  (ECF No. 10-8, at PAGEID# 600.)  At this appointment, Plaintiff indicated that she had intermittent pain for many years, with some periods of no pain and some periods of intense flareups.  Dr. Hanallah reviewed a February 15, 2012 MRI that showed lateral recess stenosis and L4/5 and L3/4 foraminal stenosis.  (*Id*. at PAGEID# 601; *see*

*also* ECF No. 10-8, at PAGEID# 744-747.)  He noted "some paraspinal tenderness" in Plaintiff's lumbar spine but "no focal lower extremity weakness." (*Id*. at PAGEID# 600-601.)  Further, he stated that "[t]he remainder of [Plaintiff's] spine, pelvis, and the exposed portions of her lower extremities had normal strength, sensation, perfusion, range of motion without evidence without atrophy, instability, dislocation, contracture, skin disruption, erythema, masses or effusion." (*Id*. at PAGEID# 601.)  Straight leg raises were negative bilaterally.  Dr. Hanallah described her gait as "somewhat awkward." (*Id*. at PAGEID# 600.)  He concluded that Plaintiff suffered "mostly back pain in the setting of a degenerative spondylolisthesis with some lateral recess stenosis and foraminal stenosis." (*Id*. at PAGEID# 601.)  He recommended physical therapy and an epidural steroid injection. (*Id*.)  He noted that if Plaintiff's "lower extremity pain worsen[ed], then surgery would be a L3-5 fusion." (*Id*.)

Plaintiff reported to Dr. Terry T. Fowler in March 2013 with Complaints of low back pain. She reported that her "most recent episode of low back pain started four weeks [prior] when she was lifting of a carseat." (*Id*. at PAGEID# 630-631.)  Dr. Fowler noted that that MRI testing showed "some facet degenerative changes and arthropathy, mainly of L4-L5 and L5-S1" with some "mild disk space narrowing" but "no significant retro or anterolisthesis, fractures or dislocation." (*Id*.)  Dr. Fowlwer further observed that although the radiology report showed "some pathology," when compared to a previous MRI on February 15, 2012, there was "no increase worsening appearance" and "some improvement at L5-S1 of the paracentral disk herniation." (*Id*. at PAGEID# 631.)  Dr. Fowler also noted "[m]oderate spinal canal stenosis, moderate right and mild left neural foraminal narrowing at L4-L5 . . . not significantly changed from previous exam," "[i]nterval decrease in the size of left paracentral disk protrusion at L5-S1," and "[r]ight foraminal disk protrusion at L3-L4 mildly narrowing the right neural foramen . . . unchanged from the

previous exam." (*Id.*)  Upon examination, Dr. Fowler noted mostly normal findings, including a full range of motion, intact strength, and no tenderness with palpation.  He also noted that Plaintiff was in no apparent distress.  Noting that the MRI did not show any objective evidence of worsening pathology since the 2012 MRI, Dr. Fowler recommended epidural steroid injections and outpatient follow-up with Dr. Hannallah.  (*Id.*)

In April, 2013, Plaintiff was seen by Dr. Amit Patel for chronic pain that she alleged was attributable to lifting a car seat into a van in February 2013.  (*Id*. at PAGEID# 610.)  On examination, Dr. Patel noted that Plaintiff had full range of motion of her cervical spine, full range of motion of the lumbar spine and no muscle spasm or tenderness in her lower back muscles.  (*Id*. at PAGEID# 611.)  Dr. Patel's assessment was that Plaintiff suffered from chronic pain syndrome, displacement of lumbar intervertebral disc without myelopathy, and thoracic or lumbosacral radiculopathy.  (*Id*.)  He noted that she would be a "good candidate for a spinal cord stimulator trial."  (*Id*.)

In August, 2013, Plaintiff was seen by Larry Todd, D.O. (ECF No. 10-11, at PAGEID# 1086-1087.)  During that visit Plaintiff reported that "she has had back pain on and off since February of 2013."  (*Id*.)  Plaintiff explained that "she was lifting her grandson at that time in a car seat several times."  (*Id*.)  Dr. Todd's impression was that Plaintiff suffered from "spondylolisthesis with stenosis L4 on L5."  (*Id*. at PAGEID# 1087.)  Dr. Todd saw Plaintiff again in September, 2013, and his impression was the same.  (*Id*. at PAGEID# 1084-1085.)  At that time Plaintiff was not interested in pursuing surgical relief.  (*Id*.)

In October 2013, neurologist Dr. Yao, upon physical examination, observed that Plaintiff "had some mile difficulty tandem walking."  (*Id*. at PAGEID# 1091.)  Dr. Yao's other physical examination findings during this visit were normal.

In December 2013, Plaintiff slipped on ice and twisted her back.  (ECF No. 10-8 at PAGEID# 775.)

## C.  Mental Impairment

Plaintiff was admitted to Mt. Carmel Hospital on March 21, 2009, with an admission diagnosis of "bipolar disorder, mixed state, severe without psychosis."  (ECF No. 10-7, at PAGEID# 269.)  She was discharged on March 23, 2009, with the same diagnosis. (*Id.*)  According to the report of Dr. Michael A. Chan, Plaintiff "insisted on being discharged home and felt she could handle things safely."  (*Id*. at PAGEID# 270.)  The day before this admission, Plaintiff had been seen in the emergency room at Mount Carmel West for the chief complaint of a panic attack. (*Id*. at PAGEID# 569.)  Plaintiff had also been seen in the emergency room at Mount Carmel West a week prior, on March 13, 2009, with a chief complaint of depression.  (*Id*. at PAGEID# 587.)

Beyond this, the record contains treatment notes from Tom Butler, MA ED LPCC-S, at WellSpring, dated March 4, 2009, through December 14, 2009.  (*Id*. at PAGEID# 286.)  At the initial visit, Plaintiff presented with a severe state of "feeling overwhelmed" and "confused."  (*Id*. at PAGEID# 293.)  Mr. Butler's initial diagnosis was depressive disorder due to surgery with a good prognosis. (*Id*.)  Review of the treatment notes reflect that the discussion was often focused on Plaintiff improving her relationship with her husband.  Many of the notes reflect only normal clinical observations, including a euthymic or neutral mood, an appropriate affect, a cooperative attitude, appropriate thought process and orientation, and neat/clean grooming.  (*See, e.g.*, PAGEID# 295, 296, 299, 302, 303, 304, 305, 307, 308, 310, 313, 315, 316, 317, 318, 319, 320, 321, 322, 329, and 331.)  The final progress note indicated that Plaintiff's affect, attitude and thought process/orientation were appropriate.  (*Id*. at PAGEID# 295.)  Mr. Butler had scheduled a follow-up appointment.  (*Id*.)

Based upon two opinions from Dr. Butler contained in the record, it appears that Plaintiff began treating with Mr. Butler again at a new location, Spirit of Peace Clinical Counseling. (ECF No. 10-8 at PAGEID# 657-59; ECF No. 10-11 at PAGIED# 1227-29.) The first of these opinions was rendered on December 18, 2013, *more than* four years after Plaintiff's DLI. (ECF No. 10-8 at PAGEID# 657-59.) That opinion indicated that Mr. Butler first saw Plaintiff in June 2012 and had last seen her in December 2013. Mr. Butler stated that Plaintiff "interacts in a consistent, favorable, and productive manner" with family friends and neighbors and that visits with family twice per week, with friends daily, with visits lasting between 30 minutes and four hours and also that she attends church weekly. (*Id*.) Mr. Butler opined that Plaintiff had a high need for rest and that she struggled in stressful situations. He further indicated that Plaintiff was able to prepare food, attend to her personal hygiene, shop, pay bills, and that she could drive for thirty minutes at a time.

The second opinion from Mr. Butler was dated March 25, 2015. (ECF No. 10-11 at PAGIED# 1227-29.) Mr. Butler opined that Plaintiff had a number of work-related limitations, but when asked to explain his bases for these limitations, he indicated that "N/A Client not working." (*Id*.) He further indicated that the mental functional capacity questionnaire he completed was applicable only for the prior 18-24 months. In a supplemental questionnaire, Mr. Butler indicated that Plaintiff's mental impairments caused only "slight": (1) restriction of activities; (2) difficulties in maintaining social functioning; and (3) deficiencies of concentration, persistence or pace resulting in failure to compete tasks in a timely manner (in work settings or elsewhere), and that she had no episodes of deterioration. (*Id*.) "Slight" was defined on the questionnaire as "A suspected impairment of slight importance which does not affect the ability to function." (*Id*. at PAGEID# 1230.)

Plaintiff was seen by Dr. Janet Mendola of Bethel Psychiatric Services from March 19, 2009 through August 5, 2011. These records indicate that Plaintiff was seen fairly regularly over the specified time period for treatment relating to anxiety and depression. The records consist primarily of Plaintiff's self reports. On March 30, 2009, Plaintiff reported that it was her first day "watching the kids" and that it went well. (*Id*. at PAGEID# 541.) In April 2009, Plaintiff reported that she hated her marriage and was considering an affair. (*Id*. at PAGEID# 535.) During two May 2009 visits, Plaintiff complained of pain in her hands, knees, and feet. (*Id*. at PAGEID# 527, 526.) During a June 2009 visit, Plaintiff reported that she had no more pain. (*Id*. at PAGEID# 525.) During a July 2009 visit, Plaintiff reported that her left rib cage hurt. (PAGEID# 527, 526.) In September 2009, Plaintiff reported financial stressors because she was no longer babysitting or babysitting less because the parents lost their jobs. (PAGEID# 517.) At the appointments just before and after her DLI, Plaintiff reported that she was feeling good and that her mood was improving. Dr. Mendola observed that Plaintiff's affect was "good." (PAGEID# 517, 518.) Over the course of these visits, Plaintiff's conditions were treated with a variety of medications including Abilify, Lamictal, Gabapentin, Lunesta, and Seroquel. (*See, e.g.,* PAGEID# 478.)

D.      **State Agency Assessments**

In September 2013, state agency consultant Dr. Esberdado Villanueva reviewed Plaintiff's medical record and concluded that Plaintiff was not disabled. His report acknowledged that there was evidence in the record reflecting that Plaintiff's had the medically determinable impairments of degenerative disc disease and an affective disorder, but concluded that the records failed to provide a sufficient basis upon which to assess the severity of these conditions between Plaintiff's alleged March 20, 2007 onset date and her September 30, 2009 DLI. (ECF No. 10-3, at PAGEID# 113-19.) He therefore declined to submit an RFC assessment. Dr. Villanueva explained as follows:

In order to be entitled for benefits your condition must be found to be severe prior to 09/30/2009. The evidence in file is not sufficient to fully evaluate your claim and the evidence needed cannot be obtained. We have determined your condition was not disabling on any date through 09/30/2009, when you were last insured for disability benefit. In deciding this, we considered the medical records, your statement, and how you condition affected your ability to work.

(*Id.* at PAGEID# 119.)

On reconsideration in January 2014, state agency reviewing consultant Kristen Haskins, PSY.D., likewise opined that Plaintiff had the medically determinable impairments of degenerative disc disease and affective disorders, which she rated as severe, but concluded that she "had insufficient evidence to assess [Plaintiff's] conditions and how they affected her ability to work" during the relevant time period. (*Id.* at PAGEID# 127.) In considering Listing 12.04 for affective disorders, Dr. Haskins specifically concluded that "there is insufficient evidence to substantiate the presence of a disorder." (*Id.*) Dr. Haskins noted that Mr. Butler's opinion was not entitled to weight because it was "not from the relevant time period." (*Id.* at PAGEID# 128.) Dr. Robert Wysokinski reviewed the record in January 2014 and likewise opined that he had insufficient evidence during the relevant period to determine the severity of Plaintiff's conditions. (*Id.* at PAGEID# 129.)

## IV.    ADMINISTRATIVE DECISION

The ALJ found that Plaintiff met the insured status requirements through September 30, 2009. (ECF No. 10-2, at PAGEID# 69.) At step one of the sequential evaluation process,[1] the ALJ stated that Plaintiff had not engaged in substantial gainful activity since March 30, 2007, the

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. See 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?

alleged onset date. (*Id.*) The ALJ found that Plaintiff had the severe impairment of status post partial tear of her medial meniscus of her right knee with degenerative joint disease. (*Id.*) The ALJ also found that Plaintiff's back pain, migraines, and kidney stones caused no more than a minimal limitation and, therefore, were nonsevere. (*Id.* at PAGEID# 70.) Additionally, the ALJ found that Plaintiff's medically determinable mental impairment of depression caused only minimal limitation and was nonsevere. (*Id.*) The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at PAGEID# 71.)

At step four of the sequential process, the ALJ set forth Plaintiff's Residual Functional Capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to lift and carry up to 50 pounds occasionally and 25 pounds frequently; can stand or walk for up to six hours in an eight hour workday; can sit for up to six hours in an eight hour workday; cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps or stairs; and can occasionally crouch, kneel, and crawl.

(*Id.* at PAGEID# 71.) Although the ALJ found that Plaintiff's medically determinable physical impairment could reasonably be expected to cause the alleged symptoms, she concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms

---

3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.   Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

were not entirely credible. (*Id*. at PAGEID# 72.) The ALJ instead found that the record did not support the degree to which Plaintiff alleged to be limited. (*Id*.) Specifically, the ALJ noted that Plaintiff's gait consistently was found to be normal; she was found to have full strength in both lower extremities; and she was able to do some household chores, go shopping in stores, do laundry, drive, and volunteer to serve food at functions. (*Id*. at PAGEID# 72-73.)

Further, in determining that Plaintiff's medically determinable mental impairment of depression was non-severe, the ALJ applied the "paragraph B" criteria. In particular, the ALJ noted that Plaintiff testified that she was able to do light household chores, prepare meals, and go shopping. (*Id*. at PAGEID# 70.) Further, the ALJ noted that, to the extent Plaintiff stated she had some difficulties with these activities, she explained that this was due to physical issues and not her mental health issues. (*Id*.) For these reasons, the ALJ found that Plaintiff had only mild limitations in the area of daily living activities. (*Id*.) Similarly, the ALJ found that Plaintiff was only mildly limited in her social functioning because, despite Plaintiff's statement that she felt safer being secluded and in her own home, because she was able to go shipping, go to church, and interact with family and friends. (*Id*.) Additionally, the ALJ found that Plaintiff suffered from only mild limitations in the area of concentration, persistence or pace because Plaintiff testified that she was able to watch a couple of hours of television and because, when she was admitted to the hospital in March, 2009, her recent and remote memory were found to be intact and she exhibited a fair degree of concentration and attention. (*Id*.) Finally, because Plaintiff's hospitalization in March 2009 was voluntary and lasted only two days, the ALJ did not consider this event to constitute an episode of decompensation of extended duration. (*Id*.)

Relying on the VE's testimony, the ALJ concluded that Plaintiff was capable of performing her past relevant work as a medical receptionist. (*Id*. at PAGEID #73). Consequently, she concluded that Plaintiff was not disabled under the Social Security Act. (*Id*. at PAGEID #74).

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007)); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399, 406 (6th Cir. 2009) (quoting Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant

on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

In her Statement of Errors, Plaintiff raises two contentions of error.  (ECF No. 11)  First, Plaintiff contends that the ALJ erred at step two of her evaluation in failing to find that her migraines, degenerative lumbar disc disease, and mental impairments were severe impairments. (*Id.* at PAGEID# 1237-1240.)  Second, Plaintiff maintains that the ALJ erred in her consideration and weighing of the opinion of Tom Butler, M.A.E.D.L.P.C.C.  (*Id.* at PAGEID # 1240-1241.)  The undersigned considers these contentions of error in turn.

### A.    The ALJ's Step Two Finding

The undersigned finds that the ALJ did not commit reversible error with respect to her step-two finding.  At step two of the sequential evaluation process, Plaintiff bears the burden of proving the existence of a severe, medically determinable impairment that meets the twelve-month durational  requirement.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *Griffith v. Comm'r*, 582 F. App'x 555, 559 (6th Cir. 2014); *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803-04 (6th Cir. 2012).  The United States Court of  Appeals for the Sixth Circuit has construed a claimant's burden at step two as "a *de minimis*  hurdle in the disability determination process."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.  1988).  The inquiry is therefore "employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint."  *Id.* at 863 (quoting *Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 90 n.1 (6th Cir. 1985)).

A severe impairment is defined as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities," 20 C.F.R. §§

404.1520(c), 416.920(c), and which lasts or can be expected to last "for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "A severe mental impairment is 'established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a plaintiff's] statement of symptoms.'" *Griffith*, 582 F. App'x at 559 (quoting 20 C.F.R. § 416.908). Thus, if no signs or laboratory findings substantiate the existence of an impairment, it is appropriate to terminate the disability analysis. *See* SSR 96-4p, 1996 WL 374187, at *2 (July 2, 1996) ("In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process set out in 20 CFR 404.1520 and 416.920 . . . .").

Significantly, "[n]o symptom or combination of symptoms by itself can constitute a medically determinable impairment." SSR 96-4p, 1996 WL 374187, at *2 (July 2, 1996). "[S]ymptoms" consist of a claimant's description of his or her alleged impairment." 20 C.F.R. § 404.1528(a). In contrast, "signs" include "psychological abnormalities which can be observed." 20 C.F.R. § 404.1528(a)-(b). In addition, "[p]sychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception." 20 C.F.R. § 404.1528(a)-(b). "Laboratory findings" include "psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." *Id*. Consistently, the Sixth Circuit has advised that "[w]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology." *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (internal quotation marks and citations omitted).

Where, as here, the ALJ determines that a claimant had a severe impairment at step two of

the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803, (6th Cir. 2003). Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545(e); *Pompa*, 73 F. App'x at 803 (rejecting the claimant's argument that the ALJ erred by finding that a number of her impairments were not severe where the ALJ determined that claimant had at least one severe impairment and considered all of the claimant's impairments in her RFC assessment); *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).

Here, the ALJ found that Plaintiff's status post partial tear of her medial meniscus of her right knee with degenerative joint disease was a severe impairment.

### 1. Mental Impairments

The ALJ acknowledged that Plaintiff had a medically determinable mental impairment, but concluded that it was not severe because it caused no more than mild limitation within the areas of daily living, social functioning, and concentration, persistence and pace and that Plaintiff had had no episodes of decompensation of extended duration. (ECF No. 2, at PAGEID# 71.)

"When there is evidence of a mental impairment documented by 'medically acceptable clinical and laboratory diagnostic techniques,' 20 C.F.R. § 404.1508, the regulations require the ALJ to follow a 'special technique' to assess the severity of the impairment, 20 C.F.R. § 404.1520a." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013). The ALJ will rate the degree of a claimant's functional limitation in four broad areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). For the first three areas, the ALJ will rate the plaintiff on a five-point scale:

"[n]one, mild, moderate, marked, and extreme." *Id*. § 404.1520a(c)(4). If the degree of the

claimant's limitation in the first three functional areas is rated "as 'none' or 'mild' and 'none' in the

fourth area," the ALJ "will generally conclude that [the claimant's] impairment(s) is not severe,

unless the evidence otherwise indicates that there is more than a minimal limitation in [the

claimant's] ability to do basic work activities. *Id*. § 404.1520a(d)(1).

Here, the ALJ offered the following discussion of her assessment of Plaintiff's degree of

functional limitation:

> The first functional area is activities of daily living. In this area, the claimant had mild limitation. During the hearing, the claimant stated that she is able to do light household chores, prepare meals, and go shopping (Hearing Testimony). For these reasons, the undersigned finds that the claimant has mild limitations in the area of activities of daily living.

> The next functional area is social functioning. In this area, the claimant had mild limitation. During the hearing the claimant stated that she felt the need to be secluded and that she felt safer in her own home (Hearing Testimony). However, the claimant also stated that she is able to go shopping in stores, go to church every Sunday, volunteer to serve food at functions, interact well with family and friends, and visit neighbors and have dinner (Hearing Testimony). For these reasons, the undersigned finds that the claimant has mild limitations in the area of social functioning.

> The third functional area is concentration, persistence, or pace. In this area, the claimant had mild limitation. During the hearing, the claimant stated that she is able to watch a couple hours of television today (Hearing Testimony). Further, upon examination, the claimant was found to have intact recent and remote memory as well as fair concentration and attention. For these reasons, the undersigned finds that the claimant has mild limitations in the area of concentration, persistence, or pace.

> The fourth functional area is episodes of decompensation. In this area, the claimant had experienced no episodes of decompensation which have ben of extended duration. The record shows that the claimant was hospitalized from March 21, 2009 until March 23, 2009 due to frequent panic attacks. However, because this hospitalization was voluntary and lasted for less than two weeks, it is not considered an episode of decompensation of an extended duration.

(ECF No. 10-2 at PAGEID# 70 (internal citations to the record omitted).)

The ALJ also accorded "some weight" to Mr. Butler's opinion that Plaintiff had only slight mental limitations.  (*Id*. at PAGEID# 71.)  She assigned "little weight" to state-agency reviewing physician Dr. Haskin's opinion that Plaintiff has a severe affective disorder, explaining that her opinion is inconsistent with Plaintiff's own allegations and that Dr. Haskin failed to support her opinion with any evidence.  (*Id.*)

The undersigned concludes that the ALJ's foregoing discussion amply supplies substantial evidence supporting her step-two finding and decision to omit mental limitations from Plaintiff's RFC.

Plaintiff's arguments to the contrary are unavailing.  According to Plaintiff, the ALJ erroneously considered only hearing testimony.  As a threshold matter, the Court is not aware of any authority that requires an ALJ to explicitly discuss all of the record evidence within a step-two analysis.  Regardless, the ALJ *did* explicitly discuss evidence beyond the hearing testimony, including a discussion of Plaintiff's hospitalization record and the opinion evidence.  Plaintiff also notes the treatment records from Dr. Mendola and Mr. Butler, but she fails to explain how these records undermine the ALJ's determination that her mental impairments do not significantly limit her mental ability to do basic work activities.  Indeed, review of the records during the relevant period (March 30, 2007, through September 30, 2009) appear to support rather than undermine the ALJ's determination.  For example, many of Mr. Butler's treatment notes reflect only normal clinical observations, including a euthymic or neutral mood, an appropriate affect, a cooperative attitude, appropriate thought process and orientation, and neat/clean grooming.  (*See, e.g.*, PAGEID# 295, 296, 299, 302, 303, 304, 305, 307, 308, 310, 313, 315, 316, 317, 318, 319, 320, 321, 322, 329, and 331.)  Dr. Mendola's treatment notes consist primarily of Plaintiff's subjective reports and fail to document psychological abnormalities observed by Dr. Mendola.  The records

further reveal that Plaintiff was paid to watch children between March 2009 and September 2009 and that she only stopped because the parents lost their jobs, a fact that she did not share with the ALJ during the hearing. (*See* ECF No. 10-7 at PAGED# 517, 541.) Finally, as explained below in the discussion addressing Plaintiff's second contention of error, the ALJ's consideration of Mr. Butler's opinions does not deprive his step-two finding of substantial evidence.

Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's challenge to the ALJ's step-two finding as it relates to her alleged mental impairments.

### 2. Migraines

With respect to Plaintiff's alleged migraines, the ALJ noted that the record showed references to Plaintiff's migraines being controlled through medication. The ALJ concluded the migraines were not severe because the record did not support a finding that Plaintiff's migraines caused "more than a minimal limitation in [her] ability to perform basic work activities." (ECF No. 10-2, at PAGEID # 70.)

The undersigned finds that substantial evidence supports that ALJ's step-two finding with respect to Plaintiff's migraines. During the relevant time period (March 30, 2007, through September 30, 2009) the record reflects only one visit to the hospital in May 2008, one visit seven months later in December 2008 with a nurse practitioner, and a follow-up visit two months later with Dr. Yao (née Trakarnpan). At the December 2008 appointment with a nurse practitioner, Plaintiff reported that she had been doing well for the past couple of years and that she had a flare-up due to stopping birth control and undergoing two surgeries. (ECF No. 10-7 at PAGEID# 265-66.) At the follow-up visit with Dr. Yao, Plaintiff reported that her December 2008 flare-up had improved and that she had not had headaches with her menses the past couple of months. Dr. Yao opined that Plaintiff's December 2008 flare-up was due to going off of birth control and

undergoing surgery and that her "headaches are well-controlled at this time." (*Id*. at PAGEID# 264.) Plaintiff was advised to call if her migraines worsened, yet she did not return again for another fourteen months, which was more than six months after her DLI. (*Id*. at PAGEID# 1115.) Notably, no treating source opined that Plaintiff's migraines caused more than a minimal limitation in her ability to perform basic work activities. *See Watson v. Astrue*, No. 5:11-cv-717, 2012 WL 699788, at *5 (N.D. Ohio Mar. 1, 2012) ("If anything, the dearth of opinions cuts in the Commissioner's favor, as, in the Sixth Circuit, it is well established that . . . the claimant—and not the ALJ—has the burden to produce evidence in support of a disability claim."). Moreover, even the state-agency reviewing physicians did not find Plaintiff's migraines to be a severe impairment.

Plaintiff's reliance upon treatment records from October and December 2011 is misplaced as those records were generated more than two years after her DLI.

Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's challenge to the ALJ's step-two finding as it relates to her alleged migraines.

### 3. Degenerative Disc Disease

The ALJ also concluded that the Plaintiff's alleged back impairment did not result in more than minimal limitations. In reaching this conclusion, the ALJ relied, in part, on the fact that imaging of Plaintiff's spine showed only minimal degenerative changes and none to mild canal stenosis or foraminal narrowing. (ECF No. 10-2, at PAGEID# 69.) These findings appeared in Dr. Mullin's report (Exhibit 1F; ECF No. 10-7, at PAGEID# 256) and Dr. Fowler's report. (Exhibit 16F; ECF No. 10-8, at PAGEID# 631.) The ALJ also cited an MRI of Plaintiff's cervical spine dated August 21, 2007 (Exhibit 6F; ECF No. 10-7, at PAGEID# 405) and an MRI of Plaintiff's lumbar spine dated February 15, 2012. (Exhibit 25F; ECF No. 10-8, at PAGEID# 745.) Beyond this, the ALJ cited to the findings of Dr. Hanallah (Exhibit 10F; ECF No. 10-8, at PAGEID# 545),

Dr. Patel (Exhibit 13F; ECF No. 10-8, at PAGEID# 555) and Dr. Todd (Exhibit 29F; ECF No. 10-11, at PAGEID# 1027, 1030), in concluding that Plaintiff had a normal range of motion in her back.

In addition, although the ALJ did not find Plaintiff's back impairment to be severe, she considered Plaintiff's allegations about how all of her conditions affected her, including Plaintiff's allegations that she could walk no more than 10-15 minutes, that she could only lift up to ten pounds, that she could only lift and carry 10 pounds, and that she had difficulty climbing stairs and kneeling. (ECF No. 10-2 at PAGEID# 72, 97-99.) Thus, even if the ALJ erred in her characterization of Plaintiff's back impairment as nonsevere, that error is harmless. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (holding that because the ALJ properly considered the impairment classified as non-severe "in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity," the ALJ's failure to classify that impairment as severe "could not constitute reversible error"); *Pompa*, 73 F. App'x at 803. Although the ALJ ultimately found Plaintiff's allegations to be not fully credible—a determination Plaintiff does not challenge—, she did conclude that Plaintiff required lifting restrictions, standing/walking restrictions, and numerous postural limitations and incorporated these limitations into Plaintiff's RFC assessment.

The undersigned further finds that substantial evidence supports the ALJ's conclusion that Plaintiff's allegations of greater limitation were not credible. Notably, no other medical source concluded that Plaintiff was more limited physically. Indeed, the ALJ found Plaintiff to be more limited than the state-agency reviewing physicians, who concluded that the record evidence relating to the relevant period was insufficient to establish any limitations.

Plaintiff's reliance upon August 2013 treatment notes from Dr. Todd to argue that she was more limited is unpersuasive. (Pl.'s Statement of Errors 9-10, ECF No. 11 (citing ECF No. 10-11 at

PAGEID# 1086, 1089).)  As Plaintiff points out in her Statement of Errors, these records do show that Plaintiff had a positive straight-leg raising test and displayed an antalgic gait.  But those records were generated almost four years *after* her DLI, which is especially significant given that Plaintiff's impairment is a degenerative condition.  Moreover, those very same notes reveal that Plaintiff reported experiencing "back pain on and off since February of 2013," when Plaintiff "was lifting her grandson at the time in a car seat several times."  (ECF No. 10-11 at PAGEID# 1086.)  Thus, this treatment record actually undermines Plaintiff's allegations of disabling back pain during the relevant period.  As the ALJ pointed out, physical examinations during the relevant period revealed mostly normal observations.  (*See* ALJ Decision, ECF No. 10-2 at PAGEID# 69; *see also* Dr. Yao's treatment records, ECF No. 10-2 at PAGEID# 264; ECF No. 10-11, at PAGEID# 1113; PAGEID# 1113 (noting normal physical examination findings, including normal motor testing, reflexes, and gait).)

Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's challenge to the ALJ's step-two finding as it relates to her alleged back impairment.

## B.    The ALJ's Consideration of Mr. Butler's Opinion

As discussed above, the record contains two opinions from Mr. Butler.  Plaintiff challenges the ALJ's consideration of both of these opinions.

Mr. Butler rendered his first opinion in December 2013.  (ECF No. 10-8 at PAGEID# 657-59.)  This opinion appears to relate to the time period when Plaintiff began treating with Mr. Butler again at a new location, Spirit of Peace Clinical Counseling, which Mr. Butler identifies as beginning in June 2012, almost three years after Plaintiff's DLI.  (*Id*.)  The ALJ assigned this opinion "little weight" because Mr. Butler is not a doctor and because she found it to be "inconsistent with the medical records showing that [Plaintiff] has a normal gain and full strength in

her lower extremities." (ECF No. 10-2 at PAGEID# 24.) Plaintiff points out that the ALJ erred in considering Mr. Butler's opinion within his physical RFC formulation and posits that if evaluated in its proper context, the ALJ may have concluded that Plaintiff had a severe mental impairment.

The undersigned concludes that the ALJ's error in evaluating this opinion in analyzing Plaintiff's physical impairments is harmless. Within the treating physician context, the Sixth Circuit has articulated three possible scenarios that could lead the Court to a finding of harmless error. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). First, the Court indicated that harmless error might occur "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it . . . ." *Id.* Second, the Court noted that if the ALJ's decision was "consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant." *Id.* Finally, the *Wilson* Court considered the possibility of a scenario "where the Commissioner has met the goal of § 1527(d)(2)–the provision of the procedural safeguard of reasons–even though she has not complied with the terms of the regulation." *Id.* Although this harmless error analysis is typically applied where an ALJ fails to supply good reasons for rejecting a treating physician's opinion, the undersigned finds its application here instructive. Applied to the ALJ's consideration of Mr. Butler's December 2013 opinion, the undersigned finds that the first and third scenarios apply. Mr. Butler's December 2013 opinion is patently deficient because it relates to a time period well outside of Plaintiff's DLI and is unsupported by his treatment records from the relevant time period. Second, the ALJ's opinion provides ample explanation for both her step-two and RFC determinations.

The second opinion from Mr. Butler is dated March 25, 2015. In this opinion, Mr. Butler evaluated Plaintiff's mental RFC and opined work-related limitations and also completed a

supplemental questionnaire in which he opined that Plaintiff's mental impairments do not affect Plaintiff's ability to function in her activities of daily living; social functioning; or concentration, persistence, or pace. Mr. Butler indicated that Plaintiff mental RFC had been at the level he assessed for the prior 18-24 months. (ECF No. 10-11 at PAGIED# 1227-29.) The ALJ assigned this opinion "some weight," noting that Mr. Butler had opined only slight mental limitations and that he is not a doctor. (ECF No. 10-2 at PAGEID# 71.) With respect to this opinion, Plaintiff argues that "[t]he ALJ failed to account or explain what weight was given to Mr. Butler's other opinions that [Plaintiff] was unable to follow work rules, relate to coworkers, deal with work stresses, interact with supervisors, and remember and carry out complex, detailed and simple work instructions." (Pl.'s Statement of Errors 10-11, ECF No. 11.) The undersigned finds no error with the ALJ's consideration and weighing of this opinion. It is clear that the ALJ agreed with Mr. Butler's that Plaintiff's mental impairments do not affect her ability to function, but did not agree that Plaintiff's impairments caused work-related limitations. To the extent the ALJ erred in not providing a greater explanation for why he rejected the specific work-related limitations Mr. Butler opined, that error is harmless because Mr. Butler's March 2015 opinion that Plaintiff had work-related limitations related to a time period years after her DLI and was unsupported by Mr. Butler's treatment notes. Further as indicated above, the ALJ's opinion provides ample explanation for both her step-two and RFC determinations.

Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's second contention of error.

## VII. DISPOSITION

In sum, from a review of the record as a whole, the undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiffs' Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII.   PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE